# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Marvin Aspen | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 677 | **DATE** | 7/14/2004 |
| **CASE TITLE** | Sandoval vs. Calumet Public School, et al | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order: Defendants motion for summary judgment (11-1) is granted in part and denied in part. Defendants motion to strike (28-1) is denied without prejudice.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | | **Document Number** |
|---|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | | | |
| | No notices required. | | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | JUL 1 5 2004 | | |
| | Notified counsel by telephone. | | | date docketed | | 32 |
| | Docketing to mail notices. | | | AMC | | |
| | Mail AO 450 form. | | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | 7/14/2004 | | |
| | | | CLERK, U.S. DISTRICT COURT | date mailed notice | | |
| | GL courtroom deputy's initials | | 2004 JUL 14 PM 4:51 | GL | | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | | |

| | |
|---|---|
| MARIA ELSA SANDOVAL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) No. 03 C 677 |
| CALUMET PUBLIC SCHOOL DISTRICT | ) |
| #132, JEROME ROBERTS, and | ) |
| HUGH JACKSON, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

MARVIN E. ASPEN, District Judge:

After she was terminated from her position as a Spanish-English language translator and teacher's aide, Plaintiff Maria Elsa Sandoval filed suit against Calumet Public School District #132 (the "district"), her former employer, Jerome Roberts, the district's former superintendent, and Hugh Jackson, the former principal of Burr Oaks School, (collectively, the "defendants."). In her complaint, brought pursuant to 42 U.S.C. § 1983, she alleges that the defendants violated her First and Fourteenth Amendment rights. She also brings a claim of retaliatory discharge under Illinois law. The defendants brought the present motion for summary judgment, which, for the reasons set forth below, we now grant in part and deny in part.[1]

Before considering the motion for summary judgment, however, we must consider a related motion, brought by the defendants, to strike portions of the evidence submitted by Sandoval in response to the summary judgment motion. Specifically, the defendants request that we strike most of Sandoval's own declaration. In the motion to strike, the defendants request that we parse through

---

[1] In her response to the summary judgment motion, Sandoval voluntarily withdrew her § 1983 claim against the district. That claim is therefore dismissed.

Sandoval's declaration paragraph by paragraph, ruling on the admissibility of each allegation contained therein. An examination of the declaration, however, reveals that it is largely duplicative of the other evidence presented by both sides, including Sandoval's own deposition testimony. In short, given the entirety of the record before us, Sandoval's declaration does not sway our decision on the summary judgment motion in either direction. We thus decline to rule on the motion to strike at this stage and simply analyze the materials before us without reference to the declaration. Our decision not to consider the declaration should not be used later as a basis for arguing that Sandoval is precluded from testifying at trial as to the matters contained in her declaration at trial. With these considerations in mind, we turn to the merits of the summary judgment motion.

## BACKGROUND

Unless otherwise indicated, the following facts are culled from the parties' Local Rule 56.1 Statements of Material Facts. Plaintiff Maria Elsa Sandoval was hired by Calumet Public School District #132 as a district translator and teacher's aide in February of 1992. Her job was to help teachers in the classroom with children who had limited English proficiency (referred to as "LEP" children). During her tenure, Sandoval became concerned that the district was not in compliance with Illinois law regarding the establishment of bilingual education programs for LEP children.[2] During the 1997-1998 and 1998-1999 school years, she raised those concerns with then Principal Rhonda Towner. (Def.'s L.R. 56.1 Statement ¶¶ 9-10.) Despite her complaints, Sandoval received outstanding employee evaluations for the 1997-1998 and 1998-1999 school years. (Pl.'s Ex. M.)

## I.     1999-2000 School Year

---

[2] Illinois law requires school boards to "establish and maintain such transitional bilingual programs as may be needed for children of limited English-speaking ability. . . ." 105 Ill. Comp. Stat. 5/14C-2.1. The parties do not dispute that the district struggled to meet its obligations under Illinois law regarding bilingual education. (Pl.'s Ex. B, Jackson Depo., at 62.)

Sandoval contacted the Illinois State Board of Education (the "ISBE") for the first time in the Fall of 1999 to voice her complaints about the district's bilingual education programs. (Pl.'s Resp. to Def.'s L.R. 56.1 Statement ¶ 31.) Posing as a parent, she complained that there were no bilingual teachers at Burr Oak School or Calumet School and that students were being held back due to their limited English proficiency. (Def.'s L.R. 56.1 Statement ¶ 34.) She did not tell anyone at the district that she had contacted the ISBE. (Def.'s L.R. 56.1 Statement ¶ 37.)

Sandoval also began speaking with parents during the 1999-2000 school year regarding the alleged deficiencies in the district's bilingual education program. She counseled at least one parent to contact the ISBE regarding the treatment of bilingual students in the district. (Def.'s L.R. 56.1 Statement ¶¶ 38-39.) She also approached the Mexican American Legal Defense and Education Fund ("MALDEF") to discuss the possibility of filing a lawsuit against the district.[3] (Def.'s L.R. 56.1 Statement ¶ 41.) She did not tell anyone at the district that it was her idea to visit MALDEF, and it is unclear whether anyone at the district knew of her involvement with the lawsuit. (Def.'s L.R. 56.1 Statement ¶ 43.)

Sandoval only received a satisfactory evaluation for the 1999-2000 school year. (Def.'s L.R. 56.1 Statement ¶ 44.) In that evaluation, the school principal rated the quantity and quality of her work as "outstanding" and noted that she had "a warm and caring relationship with bilingual children." (Pl.'s Ex. M.) However, she gave Sandoval a lower rating of "satisfactory" in the "attitude and cooperation" and "attendance and punctuality" categories of the evaluation. *Id.* The principal also noted that Sandoval was frequently absent, although her tardiness had improved. *Id.*

---

[3]A suit was filed against the district by the Mexican American Legal Defense and Education Fund on behalf of several parents in the Fall of 2001. *See Cortez v. Calumet Public Sch. Dist. #132,* 01 C 8201, 2002 WL 3117378 (N.D. Ill. Oct. 29, 2001).

## II.    2000-2001 School Year

Defendant Hugh Jackson was hired as the principal for Burr Oak School at the beginning of the 2000-2001 school year. (Def.'s L.R. 56.1 Statement ¶ 45.) Sandoval was assigned to work at the Burr Oak School that year. In the Fall of 2000, during a meeting at which Jackson was present, Sandoval was questioned about having discussed the weaknesses of the district's bilingual program with parents and about having recommended that they either contact the ISBE or lawyers about their concerns. She was told not to speak to parents at all during or after school hours and that, if she was caught speaking to parents again, she would be fired. (Def.'s L.R. 56.1 Statement ¶¶ 55-56, 60.)

Sandoval also submitted a memorandum, dated December 6, 2000 addressed to the "Members of the School Board District #132" from "staff members of the bilingual program."[4] The memorandum purports to "inform over an emergency meeting which was held on Monday, November 20, 2000. The meeting was to discuss concerns over problems with Hispanic parents all stemming from actions taken by Mrs. Sandoval." It reported that Sandoval was causing disruptions at work by recommending that parents file grievances or lawsuits against the district and telling parents that the district was not in compliance with state requirements regarding bilingual education. (Pl.'s Ex. S.) It is not apparent from the record whether the defendants knew about this memorandum.

---

[4]The defendants object to the submission of this document because it allegedly lacks foundation. Specifically, they argue that we should not consider the memorandum because it does not reflect who authored it and who received it. In ruling on a motion for summary judgment, a court may only consider evidence that would be admissible at trial. Fed. R. Civ. P. 56(e) (requiring that supporting affidavits "shall set forth such facts as would be admissible at trial."). However, "[t]he evidence need not be admissible in form (for example, affidavits are not normally admissible at trial), but it must be admissible in content." *Stinnett v. Iron Works Gym/Executive Health Spa, Inc.*, 301 F.3d 610, 613 (7th Cir. 2002). Here, the content of the statements contained in the memorandum submitted by Sandoval would be admissible at trial because it relates to the issue of whether Jackson knew about Sandoval's criticisms of the district. We therefore consider the content of the memorandum for the purposes of this motion.

In the Spring of 2001, Sandoval contacted the ISBE again to complain that a teacher had asked her to participate in grading students. (Def.'s L.R. 56.1 Statement ¶ 65.) The ISBE representative informed her that, under Illinois law, teacher's aides are not allowed to assign grades. (Pl.'s Resp. to Def.'s L.R. 56.1 Statement ¶ 65.) In 2001, Sandoval also complained to the ISBE about being placed on lunchroom duty because she felt that she had "insufficient time with under-served LEP children." (Def.'s L.R. 56.1 Statement ¶ 67; Pl.'s L.R. 56.1 Statement ¶ 19.)

Sandoval received a satisfactory evaluation from Jackson for the 2000-2001 school year. (Def.'s L.R. 56.1 Statement ¶ 68.) Jackson assigned Sandoval a rating of "satisfactory" in each of the four subject categories listed on the evaluation. (Def.'s Ex. M.) In the quantity of work category, he wrote: "I must observe more times to see the 'extra mile' effort." *Id.* In the "Other Comments" section, he wrote: "There was a lot of controversy this year concerning the bilingual program. I felt that it took away from the effectiveness of the program." *Id.*

## III.    2001-2002 School Year

Defendant Jerome Roberts was hired as Superintendent of Calumet Public School District # 132 in August of 2001. During that year, Sandoval continued to complain to Principal Jackson about the Burr Oaks School's bilingual education program. (Def.'s L.R. 56.1 Statement ¶ 73.) In the fall, Jackson called Sandoval into his office and asked her if she had contacted the state about her concerns. She said that she had not. In fact, she had. Jackson responded that "everyone" believed that she had called the state. (Def.'s L.R. 56.1 Statement ¶¶ 76-77.)

In January of 2002, Jackson asked Sandoval to "prepare a schedule detailing how she was spending her time in instructing students and how she intended to spend her time in the future instructing and working with students, but not to develop [a] curriculum as a teacher would." (Def.'s L.R. 56.1 Statement ¶ 81.) Sandoval characterized Jackson's request as an order to prepare lesson

5

plans. Around the same time, Jackson asked Sandoval to prepare grades for all of the bilingual students at Burr Oaks School. (Def.'s L.R. 56.1 Statement ¶ 86.) Sandoval contacted the ISBE on at least two occasions to inquire about whether, as a teacher's aide, she had the authority to prepare lesson plans and assign grades. (Def.'s L.R. 56.1 Statement ¶¶ 86-87.) She was told that teacher's aides could do neither. She accordingly refused Jackson's requests that she prepare the lesson plans or assist in assigning grades. (Pl.'s Resp. to Def.'s L.R. 56.1 Statement ¶ 81.) Sandoval told Jackson and several other faculty members that she had contacted ISBE to complain about these requests. (Def.'s L.R. 56.1 Statement ¶ 88.)

Sandoval also contacted ISBE during the 2001-2002 school year to complain about the Burr Oaks School keeping LEP children from attending physical education and recess so that they could complete their lessons. It is disputed whether anyone at Burr Oaks, including the defendants, knew about this particular call to the ISBE. (Def.'s L.R. 56.1 Statement ¶ 93; Pl.'s Resp. ¶ 93.)

Jackson prepared Sandoval's 2001-2002 annual review. The review itself is sparse. (Pl.'s Ex. M.) Jackson rated Sandoval in several categories using a scale of one to five, five being the highest rating possible. With regard to the first category, entitled "Quality of Work," Jackson gave Sandoval a rating of one and wrote: "Work does not meet these job requirements." In the second category, "dependability," Jackson gave Sandoval a rating of two and wrote: "I cannot depend on you to carry out assignments to completion." He again assigned her a rating of one with regard to the third category, "Ability to work with others," and wrote: "You have not demonstrated an ability to work with others in the performance of your job." He also assigned Sandoval a rating of one with regard to "Adaptability," commenting that: "The variety of assignments that you have been given within the scope of your job duties has not been carried out satisfactorily." With regard to "job knowledge," he gave her a rating of two and wrote: "It is not clear to me that you have a clear

understanding of your job." In the "job initiative" category, he assigned Sandoval a rating of two and made no comments. The evaluation also notes that attendance and punctuality were a "problem," although all of her absences had been excused. Overall, Jackson gave Sandoval a job rating of one, noted that her "job performance overall has been unsatisfactory," and recommended that she be dismissed. *Id.*

The defendants cite to Jackson's deposition testimony to further explain his decision to recommend Sandoval's dismissal. He testified that Sandoval had not followed through with his directions regarding the completion of schedules or lesson plans and that she failed to be on time for lunchroom duty on several occasions. (Def.'s L.R. 56.1 Statement ¶ 94.) Jackson also testified that Sandoval did not work well with others, citing complaints from Sandoval's co-workers (Def.'s L.R. 56.1 Statement ¶ 97.) During his deposition, Jackson was somewhat vague about these complaints. He said that three teachers allegedly complained about Sandoval, and that each of those teachers had voiced his or her concerns "more than once." When asked to describe the nature of their grievances, Jackson cited only their reports that Sandoval had been speaking out against the district and that she had been misleading parents, both during and after school. (Pl.'s Ex. B, Jackson Depo., at 58.) Finally, Jackson concluded that Sandoval was inflexible and that she did not adapt to "certain areas of her responsibility," that she was not a "self-starter," that she had trouble communicating with her supervising teacher in the classroom, and that she had problems with attendance (although he acknowledged that all of her absences were excused). (Def.'s L.R. 56.1 Statement ¶¶ 98-100.) Sandoval complains that Jackson did not spend enough time observing her teaching abilities and that much of Jackson's observation of her was done by looking through the classroom window while she worked with students. (Def.'s L.R. 56.1 Statement ¶ 105.)

Sandoval requested a meeting with Jackson and Superintendent Roberts to discuss her evaluation. (Def.'s L.R. 56.1 Statement ¶ 106.) At the meeting, which was held on June 5, 2002, Sandoval raised many of her complaints about the district's bilingual program, about the controversy over grades and lesson plans, and about her contacts with the ISBE. Lois Janich, a teacher at the school, was present and took notes at the meeting. (Pl.'s Ex. I, Depo. of Lois Janich.) During his deposition, Roberts testified that he relied on Jackson's evaluation alone and that he did not look at either her previous evaluations or any other factor in making his decision to recommend her termination to the district's school board. (Depo. of Roberts, at 34.) Based on Jackson's evaluation, he decided to recommend that the Board not offer Sandoval a new contract. (Def.'s L.R. 56.1 Statement ¶ 108.) The school board accepted Roberts' recommendation and voted to terminate Sandoval's employment. (Def.'s L.R. 56.1 Statement ¶ 113.)

## ANALYSIS

### I.    Summary Judgment: Standard of Review

Summary judgment is proper only when "there is no genuine issue as to any material fact and [] the moving party is entitled to a judgment as a matter of law." Fed R. Civ. P. 56(c). A genuine issue for trial exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). This standard places the initial burden on the moving party to identify "those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (citations omitted). Once the moving party has met this burden of production, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). However, if a party "fails to make a showing sufficient to establish the

8

existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment is required. *Celotex*, 477 U.S. at 322. In deciding whether summary judgment is appropriate, we must accept the nonmoving party's evidence as true, and draw all inferences in that party's favor. *See Anderson*, 477 U.S. at 255.

## II.     First Amendment Claim

Sandoval has brought a claim under 42 U.S.C. § 1983, alleging that Jackson and Roberts retaliated against her for exercising her First Amendment rights. Specifically, Sandoval claims that she was fired for her contacts with the ISBE and for speaking out publicly against the district's bilingual education program.

The Seventh Circuit has devised a three-part test for evaluating a public employee's First Amendment retaliation claim brought pursuant to 42 U.S.C. § 1983. First, the plaintiff must prove that the speech at issue is protected by the First Amendment. *Spiegla v. Hull*, -- F.3d --, No. 03-2480, 2004 WL 1301857, *3 (7th Cir. June 14, 2004). "Whether a government employee's speech is protected by the First Amendment is a question of law . . . even though it may [require] predicate factual determinations." *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002). Next, the plaintiff must prove that her speech "played at least a substantial part in the employer's decision to take an adverse employment action against [her]." *Id.* Once the plaintiff has carried her burden with regard to these two requirements, the burden shifts to the defendant to prove that the same action would have been taken in the absence of the employee's protected speech. *Id.* (citations omitted).

### A.     Protected Speech

According to the Seventh Circuit's test, we must first assess whether Sandoval's speech was constitutionally protected. "The First Amendment protects an individual's right to freedom of expression." *Trejo v. Shoben*, 319 F.3d 878, 884 (7th Cir. 2003). In *Pickering v. Board of*

9

*Education*, the United States Supreme Court explored the contours of a public school teacher's rights under the First Amendment. 391 U.S. 563 (1968). The Court recognized that it was unconstitutional to compel teachers to give up their First Amendment rights to speak out on matters pertaining to the public interest. *Id.* at 568. At the same time, the Court observed that a teacher's First Amendment rights were not entirely on par with those of the "citizenry in general." *Id.* at 569. The Court therefore concluded that "the problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs though its employers." *Id.*

The Seventh Circuit has broken down the Supreme Court's pronouncements in *Pickering* into a two-part inquiry. First, a public employee's speech is only protected if it involves a matter of public concern. If it does, then we must balance her "interest as a citizen in commenting on the matter against the state's interest, as employer, in promoting effective and efficient public service." *Spiegla*, --3d.-- at *3 (citing *Pickering*, 391 U.S. at 568). We address each factor in turn.

1.    **Public Concern**

The issue of whether an employee's speech touches upon a matter of public concern is a question of law for the court, and "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983). Content is the most important of these three factors. *Gustafson v. Jones*, 290 F.3d at 907 (citations omitted). Speech is considered a matter of public concern if "the speech can be fairly said to relate to a matter of political, social, or other concern to the community, rather than merely a personal grievance of interest only to the employee." *Id.* (citing *Connick*, 461 U.S. at 146).

Sandoval engaged in the following activities that could be considered speech regarding matters of public concern. First, she contacted the ISBE: 1) about being required to prepare lesson plans and assign grades;[5] 2) about being assigned to lunchroom duty when she was already stretched thin; and 3) to voice her concerns about the placement and promotion of LEP children. Second, Sandoval discussed her concerns regarding the bilingual program with parents and encouraged a group of parents to file a lawsuit against the school.

The defendants concede that Sandoval's complaints to the ISBE about the placement and promotion of LEP children *were* issues of public concern but argue that the defendants never knew about those communications. The issue of whether defendants knew of her complaints goes to the causation factor of the Seventh Circuit's test and will thus be discussed below. Similarly, the defendants do not address whether Sandoval's communications with parents regarding the bilingual program touched upon a matter of public concern. Because this is a question of law, however, we will address whether both Sandoval's calls to the ISBE and discussions with parents regarding the bilingual program were matters of public concern.

The Seventh Circuit has held that the public concern is implicated where an employee is "willing to speak up and shed light on her colleagues' improprieties." *Spiegla v. Hull*, --F.3d-- at *5. Although Sandoval was not "whistle blowing" on potential criminal violations as the plaintiff in *Spiegla* did, she was not simply "tattling on trivial office indiscretions." *Id.* Rather, Sandoval was speaking out against the substandard education of children with limited English speaking ability. Furthermore, there is absolutely no evidence in the record that would suggest that Sandoval's

---

[5]The parties debate whether Sandoval was asked to provide input into grading only or whether she was asked to assign grades. Likewise, the defendants claim that Sandoval was not asked to prepare lesson plans, but only to submit generalized plans to the principal to document her activities. At this stage, we must take the evidence in the light most favorable to Sandoval. We thus assume that she was asked to prepare both grades and lesson plans.

speaking to parents was motivated by a personal interest. *See Kokkinis v. Ivkovich*, 185 F.3d 840, 845 (7th Cir. 1999) (noting that a court should inquire into an employee's motive for bringing wrongdoing to light in analyzing the issue of whether speech touched upon a matter of public concern). The record demonstrates that Sandoval was genuinely concerned about whether the district was living up to its legal responsibilities in educating LEP children. We thus find that this portion of the First Amendment test is satisfied as to Sandoval's phone calls to the ISBE and Sandoval's discussions with parents about the shortcomings of the district's bilingual education program.

No such issue of public concern is implicated by Sandoval's contacts with the ISBE regarding lesson plans, grades, or her assignment to lunchroom duty because, as the record demonstrates, those contacts were motivated by her own personal conflicts with the school administration and not her concern for the welfare of school children. Motive is relevant in terms of addressing public concern if the "expression addresses only the personal effect on the employee." *Gustafson*, 290 F.3d at 908. However, the fact that speech is partially motivated by private interests is not dispositive. *See id.* "Motive matters to the extent that even speech on a subject that would otherwise be of interest to the public will not be protected if the expression addresses only the personal effect upon the employee or if the only point of the speech was to further some purely private interest." *Id.* (citations and internal quotation marks omitted).

Sandoval's complaints regarding lesson plans, grades, and lunchroom duty had to do with the fact that her schedule was already too full and that her time would have been better spent working with children. She indicated in her deposition that she did not want to do lunchroom duty because she already felt overworked. She also felt that she did not have enough time to prepare lesson plans or grades. When asked about the request that she prepare lesson plans, she responded that to do so

12

would have been impossible because "I'm trying to help children for third grade to sixth grade, and in more than six rooms. With half an hour lunch, when I have time [sic] to do that, my lesson plan." (Sandoval Depo. at 166.) In her deposition, she never asserted that she called the ISBE out of concern for LEP children.[6]

Furthermore, although Sandoval's complaints touched upon matters of public concern in that her time may have been more valuable to the district's bilingual children if spent in a classroom rather than the lunchroom or preparing lesson plans, the public concern factor in her complaint is minimal. *Compare, Spiegla v. Hull*, --F.3d--, 2004 WL 1301857 (7th Cir. June 14, 2004) (finding that an employee's complaints about the possibility of her co-workers committing criminal acts while on duty was speech relating to a matter of public concern). Sandoval points to no law or regulation that specifically forbade her from participating in lunchroom duty, assigning grades, or preparing lesson plans. We thus find that Sandoval's speech regarding her assignment to lunchroom duty does not constitute a matter of public concern. Her speech is thus not constitutionally protected. We are left to analyze only whether her claim that she was retaliated against for speaking out against the district's bilingual education program meets the remaining factors of the Seventh Circuit's test.

## 2. *Pickering* Balancing Test

We must next consider whether the defendants' interest in efficiently providing school services outweighed Sandoval's interest in voicing her concerns about the school's bilingual program. In *Gustafson v. Jones*, the Seventh Circuit, interpreting *Pickering*, listed a number of

---

[6]In her declaration, Sandoval does state that she was concerned "that the LEP children should receive the guidance, assistance and evaluation of a certified teacher." (Sandoval Decl., ¶ 26.) Although we have said that we will not consider Sandoval's declaration at this time, this bare allegation is not sufficient to overcome the statements made by Sandoval in her own deposition that she was motivated by the fact that she did not have time to grade students or prepare lesson plans. Thus, our decision would remain the same even if we were to consider her declaration.

"highly fact-specific" factors that a court should consider in striking the proper balance between an employer's interests in promoting effective public service and an employee's First Amendment rights:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place, and manner of her speech; (5) the context within which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision-making; and (7) whether the speaker should be regarded as a member of the general public.

290 F.3d 895, 909 (7th Cir. 2002) (citations omitted). As a general rule, the stronger the employee's interest, the more substantial showing an employer must make to justify its decision to restrict the employee's speech. *Id.* (citing *Waters v. Churchill*, 511 U.S. 661, 675 (1994)). The resolution of the *Pickering* balancing test is a matter of law. *Williams v. Seniff*, 342 F.3d 774, 782 (7th Cir. 2003).

In this case, the defendants argue that the first *Pickering* factor - problems in maintaining discipline or harmony among co-workers - is at play. They argue that, "since the District's bilingual program was under such close scrutiny from ISBE, the District needed its bilingual staff to be loyal to the program," (Def.'s Mem. in Support of Mtn. for Summ. J. at 11) and that "Jackson was working with limited resources and needed to use them as efficiently as possible." (Def.'s Reply at 10.) They do not, however, cite to a single portion of the record which would support their contention that Jackson had any trouble maintaining discipline as a result of Sandoval's speech.

Despite the defendants' shortcomings in this regard, there is some evidence in the record which suggests that Sandoval's speech did cause disruptions. Sandoval herself submitted the memorandum of several of her co-workers in which they documented that they had complained to the district's school board about the fact that Sandoval had been discussing the shortcoming of the bilingual programs with attorneys. (Pl.'s Ex. S.) Indeed, Sandoval's activities were sufficiently

disruptive that she was told during a meeting at which Jackson was present that if she continued voicing her concerns with parents, she would be terminated. (Def.'s L.R. 56.1 Statement ¶¶ 55-56, 60).

Although this evidence may suggest that Sandoval's speech caused some disruption, this factor is outweighed by the sixth factor of the *Pickering* test - whether debate was vital to informed decision-making. There is no question that the district's bilingual program was legally sub-standard and that Sandoval was speaking out about its deficiencies. In particular she highlighted the fact that the Burr Oaks School was keeping LEP children from attending physical education and recess so that they could complete their lessons. (Def.'s L.R. 56.1 Statement ¶ 93; Pl.'s Resp. ¶ 93.) She also complained that children were being held back or placed in special education because of their limited English abilities.

The defendants maintain that Sandoval's speech was superfluous because their program was already under intense scrutiny from the ISBE at the time. We disagree. The mere fact that the district was already under investigation does not diminish the importance of Sandoval's reporting on continuing violations. In fact, Sandoval herself may have been an important source of information for the ISBE. Furthermore, the fact that the district was under investigation lends even further credence to Sandoval's decision to provide information to parents about the district. It was important for parents to know that their child's school was not performing as was required by law because well-informed parents can serve as a strong force for change. Although the information provided by Sandoval portrayed only one opinion among many, she was an important voice in the debate. We thus find that Sandoval's right to speak to the ISBE and to parents outweighed the district's interest in maintaining order amongst its ranks. As such, her speech was protected by the First Amendment.

## C.    Causation

To survive the defendants' motion for summary judgment, Sandoval must also demonstrate that her speech was a substantial or motivating factor in the defendants' decision to dismiss her.[7] *Williams v. Seniff*, 342 F.3d 774, 782 (7th Cir. 2003) (citations omitted).  She need *not* demonstrate that the retaliatory action would not have occurred but for her protected activity.  *Spiegla v. Hull*, -- F.3d --, No. 03-2480, 2004 WL 1301857, *10 (7th Cir. June 14, 2004).  The defendants claim that they could not have based their decision to fire Sandoval on her complaints to the ISBE regarding the placement and promotion of LEP students because they never knew about those complaints.  Indeed, Sandoval's 1999 phone call to the ISBE on the subject was made anonymously and there is no evidence that the defendants knew of her 2001 call to the ISBE regarding the issue of teachers keeping LEP students who could not complete their lessons from attending physical education classes or taking recess.  (Sandoval Depo. at. 181-82.)

There is, however, ample evidence that Jackson knew about Sandoval's activities.  For example, Jackson was present at a meeting held in the Fall of 2000 at which Sandoval was confronted about having contacted the ISBE and about having spoken with parents.  At that meeting, she was told that if she continued speaking with parents, either inside or outside of school, she would be fired.  (Def.'s L.R. 56.1 Statement ¶¶ 55-56, 60).  In his evaluation of her at the end of the first year that they worked together, Jackson specifically wrote that "[t]here was a lot of controversy this year concerning the bilingual program.  I felt that it took away from the effectiveness of the

---

[7]Sandoval also claims that she was retaliated against in the following ways: 1) she was assigned to lunchroom duty; 2) Jackson cancelled a Cinco de Mayo festival that Sandoval had planned; and 3) she was not allowed to attend a bilingual education training seminar.  There is absolutely no evidence in the record before us that these activities were in any way at all related to Sandoval's First Amendment activities.  We thus confine our discussion to the question of whether Sandoval was terminated because of her speech.

program." (Def.'s Ex. M.) This reference is obviously directed at Sandoval's various complaints about the bilingual program. In the Fall of 2001, Jackson confronted Sandoval, asking her whether she had called the ISBE. (Def.'s L.R. 56.1 Statement ¶¶ 76-77.) Although she denied that she had, the mere fact of the question demonstrates that he was at least concerned that she had done so. *Id.* Also, in the Winter of 2000, several of the teachers drafted a memorandum in which they complained that Sandoval had been contacting parents and referring them to lawyers. It is likely that both Jackson and Roberts were aware of this memo because it was presented to the school board. Finally, Jackson admits in his Local Rule 56.1 Statement that Sandoval complained to him about the status of the school's bilingual education program. (Def.'s L.R. 56.1 Statement ¶ 73.) The fact that Sandoval made these complaints demonstrates at the very least that he knew Sandoval was dissatisfied with the program. That, coupled with the fact that the school district had been sued by an outside organization and investigated by the ISBE, suggests that Jackson at least believed that Sandoval had been talking with the ISBE and parents about the program. Whether he actually knew about the particular phone calls that Sandoval had made to the ISBE is less relevant than Jackson's subjective belief that Sandoval had done so.[8]

There is also evidence that Jackson was at least in part motivated by Sandoval's speech when he made his decision not to recommend her retention. In his deposition, Jackson admitted that, in his

---

[8]The defendants assert that there is no evidence of causation because there was a time lapse between when Sandoval made her complaints and when she was fired. It is true that a time lapse between protected activity and an alleged incident of retaliation may belie any assertion that the latter was caused by the first. *Horwitz v. Board of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602 (7th Cir. 2001). Indeed, the record reflects that Sandoval began making her complaints as early as 1997 and that she continued to receive positive evaluations until the 2001-2002 school year. It was not until the end of the 2002 school year that Sandoval was fired. However, the complaints were ongoing even at the end of the 2002 school year. Furthermore, as we note above, there is evidence that Jackson specifically considered Sandoval's protected activity when he decided to recommend her dismissal. We thus do not find the time gap between when Sandoval *began* making her complaints and when Jackson recommended her termination to be determinative.

final evaluation of Sandoval's performance, he took into consideration the fact that teachers complained to him "more than once" that Sandoval was saying things against the District and misleading parents, both during and after school. (Pl.'s Ex. B, Jackson Depo. at 58.) When asked why he gave Sandoval such a low rating in the category of "job knowledge," Jackson replied that it was primarily because of her refusal to write up lesson plans and "being at the right place at the right time so to speak, being involved in controversy." (Depo. of Jackson at 110.)

This testimony is bolstered by circumstantial evidence of pretext. First, in 2002, Sandoval received a sub-par recommendation for the first time since 1997, and she was rated very low in categories in which she had been consistently rated much higher. Second, although there is some controversy among the parties with regard to this issue, Sandoval claims that her evaluation was written after a minimal amount of observation. Indeed, Jackson admits that much of his observation of her teaching skills involved him watching her through a window. All of these factors suggest that Jackson's reasons for recommending Sandoval's dismissal were pretextual.

The evidence of motivation is not so apparent with regard to Superintendent Roberts. Both parties agree that Roberts was not at all involved in observing or evaluating Sandoval during the school year. It was only once Jackson had made his recommendation to terminate Sandoval that Roberts became involved. He claims that he relied on Jackson's evaluation and did not take any other factors into account. Sandoval did present evidence that Roberts was aware of her First Amendment activities. She presented the deposition testimony of Lois Jancich, who was present at a meeting between Jackson, Roberts, and Sandoval, at which the parties discussed Sandoval's poor performance evaluation. (Pl.'s Ex. I, Depo. of Lois Jancich.) Although Roberts himself claims that he does not remember the meeting, Jancich claims that she took notes and, in her deposition testimony, she recounted the matters that the parties discussed at the meeting. Sandoval raised all of

her concerns about the bilingual program and discussed the fact that she had contacted the ISBE. Awareness of Sandoval's First Amendment activities, however, is not sufficient to demonstrate that her speech was a substantial motivating factor in his decision to dismiss her. There must be evidence that Roberts was *motivated* by those activities, and there is no such evidence in the record before us.[9] Summary judgment is therefore granted with respect to Sandoval's First Amendment claim against Roberts.

### D. Burden Shifting

Once the plaintiff has carried her burden by showing that she engaged in protected First Amendment activity and that it was a motivating factor in the adverse employment action taken against her, the burden shifts to the defendant to prove that the same action would have been taken in the absence of the employee's protected speech. *Spiegla v. Hull*, -- F.3d --, No. 03-2480, 2004 WL 1301857, *3 (7th Cir. June 14, 2004). During his deposition, Jackson attempted to list several reasons for his decision to recommend Sandoval's termination. He mentioned the ongoing dispute over lesson plans, schedules, grading, and being placed on lunchroom duty. However, he elaborated on those reasons only after the present suit had been brought; none of the reasons cited by Jackson in his deposition were written into his review of her. Furthermore, at his deposition, he cited the fact that Sandoval did not get along well with the other teachers as part of his rationale for recommending Sandoval's dismissal. These issues, he said, were related to those teachers' reports that Sandoval had been speaking out against the district and that she had been misleading parents,

---

[9]First Amendment cases brought under § 1983 differ from Title VII cases, in which an employer with decision-making authority may be liable if he acts as a "rubber stamp" upon a subordinate's retaliatory actions. There is no *respondeat superior* liability in § 1983 cases, so the fact that Roberts blindly relied upon Jackson's evaluation without conducting his own review does not subject him to liability. *Mateu-Anderegg v. School Dist. of Whtiefish Bay*, 304 F.3d 618, 623 (7th Cir. 2002) (comparing retaliation cases brought pursuant to Title VII with those brought under § 1983).

both during and after school. (Pl.'s Ex. B, Jackson Depo., at 58.) This is an admission that he took Sandoval's First Amendment activities into account when he decided not to recommend the renewal of her contract. We thus find that Jackson did not meet his burden of demonstrating that he would have made the same decision regarding Jackson's employment despite her First Amendment activity.

## D.    Qualified Immunity

The United States Supreme Court has set forth a two-part test for assessing whether a defendant is entitled to qualified immunity. First, we must consider whether the facts, taken in the light most favorable to the party asserting the injury, show that the defendant's conduct violated a constitutional right. *McGreal v. Ostrov*, 368 F.3d 657, 682 (7th Cir. 2004) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Next, we must consider "whether the right in question was clearly established at the time of the violation." *Id.* at 683.

Government employees are entitled to First Amendment rights and that an employer may not retaliate against an employee for exercising those rights. *Gustafson v. Jones*, 290 F.3d 895, 913 (7th Cir. 2002). The first part of the Supreme Court's qualified immunity standard is therefore easily met. The second portion is also satisfied in this case because Sandoval's rights were clearly established at the time of her dismissal. The defendants admit that Sandoval's calls to the ISBE regarding the proper administration of the bilingual program touched upon matters of public concern. Her conversation with parents about those same issues is no different. Sandoval believed that the district was violating Illinois law, and it is well-established that speech regarding an employer's potential violation of the law is protected. *Spiegla v. Hull*, --F.3d-- at *5. Therefore, the defendants are not entitled to qualified immunity.

## III.  Common Law Retaliatory Discharge

In addition to her constitutional claims, Sandoval also asserts the Illinois common law tort of retaliatory discharge.[10] "Illinois is an at-will employment state, which means that in general an employee can be discharged at any time for any reason or for none at all." *Brandon v. Anesthesia & Pain Management Assoc., Ltd.*, 277 F.3d 936, 940 (7th Cir. 2002) (citations omitted).  There are, however, exceptions to that rule.  The common-law tort of retaliatory discharge presents one such exception.  *Id.*  To prove a claim of retaliatory discharge, a plaintiff must demonstrate: 1) that she was discharged; 2) in retaliation for her activities; and 3) that her discharge violated a clearly mandatory public policy of the state of Illinois.  *Arres v. IMI Cornelius Remcor, Inc.*, 333 F.3d 812, 813 (7th Cir. 2003) (citing *Hinthorn v. Roland's of Bloomington, Inc.*, 519 N.E.2d 909, 911 (Ill. 1988)).

We first consider whether Sandoval's discharge based on her refusal to prepare lesson plans and grades as well as her complaints about lunchroom duty constitute retaliatory discharge.  The defendants argue that summary judgment should be granted because her complaints about these activities did not touch upon a mandatory public policy.  Determining what does and does not violate Illinois public policy is not an easy task.  Indeed, the Illinois Supreme Court has referred to this determination as the "Achilles heel" of the tort of retaliatory discharge.  *Palmateer v. Int'l Harvester*

---

[10]The Seventh Circuit has stated on several occasions that there is conflict over how a federal court should address a motion for summary judgment on a retaliatory discharge claim.  *See, e.g., Borcky v. Maytag Corp.*, 248 F.3d 691, 696 n.3 (7th Cir. 2001) (recognizing the conflict).  While Illinois courts use the "direct" method for assessing such claims at summary judgment, it is unsettled whether Illinois retaliatory discharge cases brought in federal court should be analyzed using the burden-shifting method presented in *McDonnell Douglas*.  *Id.*  The Seventh Circuit has declined to decide the issue.  *Id.*  In this case, neither party has addressed the *McDonnell Douglas* approach at all.  We thus employ the direct method of analysis used by Illinois courts.

*Co.*, 421 N.E.2d 876, 879 (Ill. 1981). The Illinois Supreme Court has, however, set forth some standards. Specifically, the Court has said that:

> [P]ublic policy concerns what is right and just and what affects the citizens of the State collectively . . . It is to be found in the State's constitution and statutes and, when they are silent, in its judicial decisions . . . a matter must strike at the heart of a citizen's social rights, duties, and responsibilities before the tort will be allowed.

*Id.* at 878-79 (citations omitted). For example, public policy is plainly implicated where a person is fired for refusing to engage in criminal conduct or for reporting the criminal conduct of others. *Id.; see also Brandon,* 277 F.3d at 941. It is also implicated where issues of public safety are involved. *Prince v. Rescorp Realty,* 940 F.2d 1104 (7th Cir. 1991) (finding that public policy was implicated where an employee reported problems with a building's fire safety system to local officials).

Based on these general guidelines, we find that Sandoval's complaints regarding grades, lesson plans, and lunchroom duty do not sufficiently implicate a clearly mandatory public policy of Illinois. First, although Sandoval claims that she was told that teacher's aides should not prepare lesson plans and grades, there is nothing in Illinois law which specifically bars teacher's aides from doing so. Relevant regulations regarding teacher's aides state only that they "shall not be utilized as substitutes or replacement of certified teachers, and they shall not have equivalent responsibilities. Certified teachers shall exercise professional judgment when assigning duties, such duties [are] not to infringe upon the 'instructional judgment' reserved for teachers." Ill. Admin. Code tit. 23, § 25.510. Although it is not unreasonable for a person to interpret the phrase "instructional judgment" as encompassing both grades and lesson plans, the regulation says nothing specifically about either task. As noted above, to provide the basis for a retaliatory discharge claim, the public policy at issue must be found in the state's constitution, statutes, or judicial decisions. *Palmateer,* 421 N.E.2d at 878-79. There is nothing in the Illinois case law regarding retaliatory discharge which would suggest

that an employee's actions based on an *interpretation* of a regulation could provide the basis for a

retaliatory discharge claim.[11] The Illinois Supreme Court has cautioned against the expansion of the

retaliatory discharge tort on several occasions, and we do not believe that Illinois courts would allow

for its expansion in this case. *See Prince v. Rescorp Realty*, 940 F.2d 1104, 1107 (7th Cir. 1991)

(noting that the Illinois Supreme Court has narrowly construed the tort of retaliatory discharge and

restricted its expansion). We thus grant the defendants' motion for summary judgment as it relates to

Sandoval's speech regarding grades and lesson plans.

At the same time, the defendants concede that Sandoval's complaints to parents and the

ISBE regarding the district's bilingual education program touched upon a clearly mandatory public

policy of the state of Illinois. As noted above, the Illinois code provides that LEP children are

entitled to certain educational opportunities. Sandoval felt that the school was violating the Illinois

code by failing to provide those opportunities to school children. The defendants thus focus on a

different element of a retaliatory discharge claim and argue that Sandoval failed to establish a causal

link between her complaints about the program and her discharge. *See Hinthorn*, 519 N.E.2d at 912

(noting that the second element of a retaliatory discharge claim "basically requires that plaintiff

allege the causal relationship between the employee's activities and the discharge."). Under Illinois

law, the causation requirement is not satisfied if the employer has a valid, non-pretextual reason for

his decision to dismiss the plaintiff. *Jackson v. Bunge Corp.*, 40 F.3d 239, 242 (7th Cir. 1994). As

we discussed in the causation section above, there is sufficient evidence in the record to raise a

genuine issue of material fact as to whether Jackson's stated reasons for recommending Sandoval's

termination were pretextual. Specifically, there is evidence which suggests that: 1) Jackson knew of

---

[11]Similarly, there is absolutely nothing in Illinois or federal law which suggests that Sandoval's assignment to lunchroom duty violated a clearly established public policy. We thus dismiss that portion of her retaliatory discharge claim outright.

Sandoval's speech; 2) he took complaints from teachers regarding Sandoval's speech into account when he recommended her termination; 3) he did not spend a significant amount of time observing her before writing her evaluation; and 4) he wrote a sparse evaluation, expounding upon his rationale for his recommendation that she be terminated only *ad hoc*, during his deposition. Based on our discussion of these factors as set forth above, we believe that there is sufficient evidence to raise a genuine issue of material fact for trial on the issue of whether Sandoval was terminated *because of* her "whistle blowing" activities. We therefore reject summary judgment as to Jackson with regard to these issues.

Finally, we consider whether summary judgment is appropriate as to Roberts with regard to the retaliatory discharge claim. Once again, the defendants claim that there was no causal link between Roberts' decision to recommend Sandoval's dismissal and her protected activity. We agree. As stated above, there is evidence in the record which indicates that Roberts knew of Sandoval's complaints to the ISBE and to parents. However, there is no evidence which would indicate that Roberts took this information into account when he recommended her dismissal to the school board. Roberts' stated rationale for recommending dismissal was based entirely on Jackson's poor performance review. Sandoval contends that this rationale is pretext. In support of her argument, she highlights as suspicious the fact that Roberts does not remember the meeting that he had with her to discuss her evaluation. She also argues that the fact that Roberts considered only Jackson's evaluation and not her previous years' evaluations is evidence of pretext. Although these points highlight the fact that Roberts may not have engaged in a careful review of Sandoval's teaching

abilities, they are not sufficient to demonstrate a causal link between her protected activities and his decision to recommend her dismissal. Summary judgment is therefore granted as to Roberts.[12]

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted in part and denied in part. It is granted insofar as Sandoval has brought federal and state law claims based on her complaints to the ISBE regarding lesson plans, grades, and the assignment to lunchroom duty. Summary judgment is also granted as to Roberts and as to Sandoval's § 1983 claim against the school district. It is denied insofar as her federal and state law claims relate to her complaints to the ISBE and to parents about the district's bilingual education program. It is so ordered.

MARVIN E. ASPEN
United States District Judge

Dated: ___7/14/04___

---

[12]Although the defendants specifically raised arguments as to why the school board could not be held liable on Sandoval's First Amendment claim, they provide no arguments about the school board with regard to her retaliatory discharge claim. We thus do not address this issue in this opinion.